Stephanie A. Ackerman
**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Tel: (212) 589-4200
Fax: (212) 589-4201
Email: sackerman@bakerlaw.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NIPPON YUSEN KABUSHIKI KAISHA and NYK LINE (NORTH AMERICA) INC. | Civil Case No. |
| Plaintiffs, | |
| v. | **COMPLAINT AND JURY DEMAND** |
| BNSF RAILWAY COMPANY and UNION PACIFIC RAILROAD COMPANY | |
| Defendants. | |

Plaintiffs Nippon Yusen Kabushiki Kaisha and NYK Line (North America), Inc. (collectively "NYK"), by and through their undersigned attorneys, bring this antitrust action for treble damages, costs, and attorneys' fees against Defendants BNSF Railway Company ("BNSF") and Union Pacific Railroad Company ("UP") (collectively "Defendants"), alleges as follows:

## INTRODUCTION

1.      Since at least 2000, BNSF and UP, which controlled about 90% of rail freight traffic in the western United States, along with non-party U.S. railroad companies in the eastern United States, conspired to fix prices in violation of Section 1 of the Sherman Act. Defendants' conduct included fixing rate-based rail fuel surcharges ("FSCs") for a dozen years or more.

2.     Through meetings, phone calls, emails, and other communications with each other,[1] or conveyed through other railroads, Defendants reached and refined their coordinated implementation of FSCs across their customer bases for rail freight services in both the western and eastern United States. This included Defendants agreeing to deploy "rate-based" FSCs—i.e., surcharges that use a percentage applied to the base rate for a shipment—as a means to impose across-the-board rate increases on rail freight shipments, an ingenious methodology that enabled Defendants to apply and enforce fixed-prices on their customers shipping across the country, including those, like NYK, that purchased intermodal freight rail and had contracts for shipping services.

3.     Defendants continuously coordinated to increase the efficacy of the conspiracy they had reached by the early 2000s. No later than 2003, for example, senior executives at the highest levels of the conspiring railroads had exchanged with one another the implementation of such aggressive FSCs that the Surface Transportation Board ("STB") later found "no real correlation" between the FSCs increases and the changes in fuel costs for which FSCs supposedly were to cover.

4.     For example, in March 2003, UP's Chief Marketing Officer ordered an escalation of its FSC program to be substantially more aggressive. The very next day, UP's CMO met with an eastern railroad to discuss "fuel surcharge methodology." Within a week, the eastern railroad matched UP's escalation. A few weeks later, senior executives for BNSF and an eastern railroad met to discuss "synchroniz[ing]" FSCs. Action items for the meeting included: "BNSF's fuel

---

[1] Certain allegations about the evidence are premised on factual assertions reflected in pleadings and other court documents filed by former court-appointed lead class counsel, which had full access to the discovery record in the former class suit alleging the railroads conspired to violate the antitrust laws.

surcharge is structured differently than … and UP. Should BNSF's by [sic] synchronized with the other big players in the industry?"

5.      Defendants' conduct following the meeting confirmed their increasing synchronized coordination on FSCs in both the western and eastern United States. In early March, UP floated a "proposal" that would aggressively escalate FSCs at roughly twice the rate of its existing formula. After meeting with UP's Chief Marketing Officer, an eastern railroad, a few days later, announced another aggressive FSC program, with a lower trigger and higher base-rate multiplier. Within days, UP decided to adopt "the same approach."

6.      On April 1, 2003, senior executives for BNSF and an eastern railroad met, with an agenda confirming their discussion of "Fuel Surcharge." Documents also reveal that during April 2-6, BNSF's senior executives maintained another discussion with an eastern railroad on "the fuel surcharge issue" at a National Freight Transportation Association meeting.

7.      On April 4, 2003, UP sent a "concurrence" to competitors that its new FSC program will "apply to most Union Pacific pricing documents for local and interline freight movements . . . ." Upon receipt, BNSF's marketing officer reacted ecstatically: "This is sweet !!!". He also confirmed that the program was just like that of UP's competitor, as would be expected for an effectively implemented conspiracy.

8.      Defendants also coordinated conspiracy conduct through their trade association. In the fall of 2003, for instance, BNSF and UP initiated an effort in the Association of American Railroads ("AAR") to ensure that they, along with eastern railroads, had agreement to remove fuel costs from certain industry indices such the All Inclusive Index ("AII") and Rail Cost Adjustment Factor ("RCAF") (which already permitted Defendants to recover all of their fuel costs), so they could more easily maintain artificially high FSCs as a revenue enhancement mechanism. As a

result, the AAR—whose board was dominated by Defendants—created an unprecedented All Inclusive Index Less Fuel ("AAILF"). Defendants' conspiratorial implementation of the AAILF allowed Defendants to apply their FSCs more easily.

9.     Defendants worked tirelessly to achieve 100% FSC coverage across their customers. Defendants pursued 100% participation goals and tracked their progress toward attaining that goal. Defendants also policed the conspiracy by exchanging FSC coverage data with one another and others. In addition, Defendants started their negotiations for freight rail charges, including those provided by contract, by using their uniform FSC formula, meaning that any deviations from that standard FSC application still resulted in supracompetitive all-in rates for customers whether or not they shipped by contract.

10.     Throughout the conspiracy and despite strong customer pushback against Defendants' imposition of FSCs, Defendants set aside their individual, economic self-interest to undercut one another and instead staunchly maintained their FSC program to the economic detriment of their customers. Instead of maximizing their economic interests, Defendants conspired to assess matching FSCs, without waivers or discounts, to their entire customer bases applied across all rail freight traffic, including carload traffic (i.e., shipments that travel from origin to destination only by railcars) and intermodal traffic (i.e., shipments that travel by rail and one other mode of transportation such as truck or ship). Defendants' senior executives and chief marketing officers oversaw their railroads' carload and intermodal traffic alike and sought to apply FSCs to them broadly.

11.     Once the conspiracy was underway, Defendants had no fear of customer loss as their imposition of these rate-based FSCs industry-wide meant that there were no competitive providers of freight rail services available to Defendants' customers, and their customers could not

leverage to threaten taking business elsewhere. As an internal BNSF report from 2005 recognized, however, this only worked because Defendants adhered to the scheme: "it would only take one competitor to abandon this in an attempt to gain market share to cause this to fall."

12.    Defendants' successful implementation of the conspiracy reversed a long trend of decreasing profits. Their profits had stopped declining by 2000 and then began to trend upward for the first time in decades. Directly undermining the pretense that the FSCs were genuine fuel cost recovery mechanisms, as oil prices skyrocketed from approximately $40 to $150, so did Defendants' profits. A Senate Commerce committee report concluded that railroads' "[SEC] filings shows just how profitable the large rail companies have become over the last decade," and included the following chart documenting the significant growth in profits:



*Figure 1 – Combined Profit Margins (Net Income/Revenue) for BNSF, Union Pacific, CSX, and Norfolk Southern, 2000-09 (Source: SEC filings)*

Absent conspiracy and in a competitive market, Defendants would have competed for customers by offering lower FSC rates long before their profit margins had nearly doubled by 2008.

13.    Defendants themselves attributed their record profits to revenues reaped from maintaining inflated FSCs. BNSF's freight revenues "increased 15 percent [in 2006] to a record high of $14.5 billion on double-digit increases in each of our four business units." "Growth in prices and fuel surcharges drove average revenue per car/unit up 9 percent in 2006 to $1,367 from

$1,258 in 2005." Likewise, UP "achieved record revenue levels [in 2006] in all six of our commodity groups, primarily driven by better pricing and fuel surcharges."

14.     In contrast to Defendants' profit growth from inflated FSCs, NYK suffered substantial economic harm as a result of Defendants' unlawful conduct. NYK purchased nearly $1 billion of unregulated rail freight transportation services[2] from Defendants. These purchases included FSC assessments that were inflated by many millions of dollars as a result of Defendants' conspiracy.

## THE PARTIES

15.     Plaintiff Nippon Yusen Kabushiki Kaisha ("NYK Japan") is a corporation organized under the laws of Japan, with its principal place of business at 3-2, Marunouchi 2 Chome, Chiyoda-Ku, Tokyo 100-0005 Japan. For more than 100 years, NYK Japan, and its subsidiaries, have provided customers with comprehensive shipping services around the globe. During times relevant to this complaint, NYK purchased unregulated rail freight transportation services directly or indirectly from and paid intermodal FSCs directly or indirectly to one or more of the Defendants to transport intermodal shipments between ports, docks, terminals, and gateways nationwide.

16.     Plaintiff NYK Line (North America), Inc. ("NYK NA"), a subsidiary of NYK Japan, is incorporated under the laws of Delaware, with its principal place of business at 300 Lighting Way – 5th floor, Secaucus, New Jersey 07094. NYK NA is the main American unit of NYK Japan and serves as agent and representative for NYK Japan, handling inland services throughout the United States. During times relevant to this complaint, NYK NA purchased

---

[2] As explained below,  the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

unregulated rail freight transportation services directly from and paid intermodal FSCs directly to one or more of the Defendants to transport intermodal shipments between ports, docks, terminals, and gateways nationwide.

17.     As a proximate result of the conspiracy described herein, NYK paid FSCs in connection with the unregulated rail freight transportation services obtained from Defendants that they would not have imposed or maintained in the absence of the conspiracy; and therefore the prices NYK paid to Defendants for those unregulated rail freight transportation services with FSCs were greater than the prices NYK would have paid absent the conspiracy. NYK has therefore been injured in its business and property by reason of Defendants' antitrust violations.

18.     Defendant BNSF has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF is a major freight railroad operating primarily in the western United States. BNSF has railway lines throughout the western United States and maintains interconnections with eastern and other rail carriers to handle freight to and from other parts of the country, including in this District.

19.     Defendant UP has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is a major freight railroad operating primarily in the western United States. UP has railway lines throughout the western United States and maintains interconnections with eastern and other rail carriers to handle freight to and from other parts of the country, including in this District.

20.     The anticompetitive and unlawful acts alleged in this complaint were authorized, ordered, or executed by Defendants' respective directors, officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' businesses or affairs.

21.     Various individuals, partnerships, corporations, associations, persons, and/or firms not named as Defendants in this complaint participated as conspirators in the violations alleged herein and performed acts and made statements in furtherance of the conspiracy. These conspirators who are not named as Defendants include, but are not limited to, railroads operating in the eastern United States that implemented and maintained FSCs in coordination with Defendants.

## JURISDICTION AND VENUE

22.     This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorneys' fees and costs from Defendants for the injuries sustained by NYK by reasons of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

23.     Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

24.     Venue is proper in this judicial District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391, because Plaintiff NYK NA has its principal place of business in New Jersey. In addition, during times relevant to this complaint, one or more Defendants resided, transacted business, were found, or had agents in this District, and a substantial part of the events giving rise to NYK's claims occurred and a substantial portion of the affected interstate trade and commerce described below, has been carried out, in this District.

25.     This Court has personal jurisdiction over each Defendant because, inter alia, each: (a) transacted business in this District, including offering, marketing, promoting, and selling rail freight services to NYK in New Jersey and, upon information and belief, other New Jersey residents; (b) directly or indirectly sold and delivered rail transportation services in this District, including delivering rail transportation bills and invoices to NYK in New Jersey and receiving

payments from NYK in New Jersey for rail transportation services; (c) had substantial aggregate contacts with this District, including numerous telephone calls, letters, facsimiles, and electronic communications to NYK in New Jersey and, upon information and belief, with other New Jersey residents; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District, including NYK and other New Jersey residents.

## INTERSTATE TRADE AND COMMERCE

26.     Defendants accounted for a substantial proportion of all rail shipments within the United States during the time relevant to the complaint. The AAR Policy and Economics Department, for instance, reported that railroad total operating revenue in the United States in 2006 exceeded $52 billion.

27.     The activities of Defendants were within the flow of, and substantially affected interstate commerce. Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers and customers throughout the United States during the time relevant to the complaint. Each Defendant used instrumentalities of interstate commerce to sell and market rail freight transportation services.

28.     The unlawful activities of Defendants have had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## BACKGOUND

29.     Congress deregulated the railroad industry with passage of the Staggers Rail Act of 1980 ("Staggers Act"). This landmark legislation marked a dramatic change in the evolution of U.S. railroads. After decades of regulatory control over virtually every aspect of their economic operations, railroads were free to set market rates for rail transportation.

30. Prior to the Staggers Act, railroads for freight transport generally would only charge the published tariff rates filed by the railroads with the Interstate Commerce Commission ("ICC"). During that era of full regulation, railroads could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis.

31. Today, by contrast, 80% or more of all rail shipments move under private transportation contracts, which are not rate-regulated, or are otherwise exempt from rate regulation. For all of this rate-unregulated traffic, the railroads cannot turn to some agency—like the previously-existing ICC—to obtain across-the-board increases in freight rates, nor can the railroads lawfully collude to set those rates.

32. NYK purchased unregulated rail freight transportation services at rates that included FSCs pursuant to private contract during times relevant to this complaint. These rates were not regulated by the ICC or were otherwise exempt from regulation pursuant to 49 U.S.C. § 10706 or other statutes, regulations, or law.

33. Since the Staggers Act, the number of Class I railroads has declined dramatically, from 35 at the time of passage of the Staggers Act to just seven today (two of which are owned by Canadian entities). The railroad industry was highly concentrated during the time of the conspiracy. Four railroads—Defendants BNSF, UP, and two eastern railroads—operated more than 90% of all railroad track in the United States and in 2006 accounted for nearly $50 billion in total annual revenue. Given the high fixed costs in the railroad industry and its significant barriers to entry (i.e., the need to invest in a vast network of tracks, stations, yards, and switching facilities that take decades to develop, and require onerous regulatory and environmental reviews and approval), there is only a fringe or niche market of smaller carriers, and the competition offered

by these small carriers is negligible and not a substitute for large shippers like NYK with nation-wide rail freight requirements.

34.     For many years before Defendants conspired, they confronted a long-term, structural decline in rail freight rates, as reflected in a figure prepared by the STB's Office of Economics, Environmental Analysis & Administration Section of Economics:



35.     Facing this long-term decline in revenues, Defendants, by no later than 2000, took various actions designed to stop the decline and ultimately increase rail freight prices and revenues. By this time Defendants understood that they could not achieve their revenue enhancement objectives unless the FSC was widely applied on a coordinated basis across the country because, among other reasons, cross-country intermodal rail freight interconnected the western and eastern railroads.

## IMPLEMENTATION OF CONSPIRACY

36.     Beginning in the early 2000s, Defendants' senior executives—including their CEOs and top sales and marketing executives—engaged in an extraordinary series of in-person meetings, phone calls, and email communications, directly and through other railroads, concerning the implementation of an industry-wide and enforced FSC program. The purpose of these

communications was to discuss, and agree upon, FSC policies and practices intended to apply across-the-board to shippers across the country.

37.     As part of the implementation of Defendants' conspiracy, UP issued a "Revised Fuel Surcharge Recommendation" and "Proposal" on March 11, 2003, attributed to UP's Chief Marketing Officer Jack Koraleski. Under UP's "Revised" proposal, FSCs would be more aggressive, escalating at roughly twice the rate of the formula other railroads had considered. The "Revised Surcharge proposal" retained the $28 West Texas Intermediate ("WTI") strike price of UP's existing program but would increase by 0.4% for every $1 increase in the WTI index, compared to UP's existing formula, which called for a 2.0% increase for every $5 increase in the WTI index.

38.     The following day, Koraleski traveled to meet his counterpart at an eastern railroad to play golf, socialize, and discuss "fuel surcharge methodology." Beforehand, Koraleski and the other railroad's executive vice president of sales and marketing, "talked on" the subject of "[f]uel surcharge methodology." Within a week of the meeting, the eastern railroad announced a new FSC policy. While retaining a $23 WTI trigger, the company adopted the more aggressive escalation formula proposed in UP's "Revised Surcharge proposal." Thus, under the new FSC policy, the company, in agreement with Defendants, would assess a 0.4% FSC when the price of oil on the WTI index exceeded $23 per barrel, and an additional 0.4% for every dollar increase above $23.48.

39.     Further, unlike its predecessor program, which required the price of oil to exceed the threshold price ($28 per barrel under the old program) for 30 consecutive days, the eastern railroad's new program would be based on the average price of oil from the preceding month. The company reasoned that while these modifications to its FSC program might "seem[] somewhat

benevolent," they would actually result in "a large increase in fuel surcharge billings – maybe as much as 100%."

40.     On March 31, 2003, UP decided to adopt "the same approach," that it had proposed and discussed two weeks earlier. UP would impose a 0.4% FSC at a monthly-average WTI "trigger" price of $23 (i.e., the index price at which FSCs begin), and assess an additional 0.4% charge for every dollar increase in the WTI index above $23.

41.     BNSF, which had previously discussed the need for a "synchronized" FSC policy with conspiring railroads, had a predictably positive reaction to UP's announcement: "This is sweet!!!!" BNSF also observed that the program was just like the proposal UP had proposed.

42.     On March 18, 2003, senior executives with BNSF—including its Chairman, President, and CEO Matt Rose, current President and CEO and then-VP and COO Carl Ice, CMO John Lanigan, CFO Tom Hund, VP of Network Strategy Pete Rickershauser, VP of Consumer Products, and head of intermodal activities Steve Branscum—met with their counterparts for an eastern railroad and discussed how the FSC programs of Defendants and other railroads were structured, and then adopted an "action item" for the BNSF and the other eastern railroad's senior marketing officers to address "synchroniz[ing]" their programs. This discussion point was assigned to BNSF's Lanigan and his counterpart from the other railroad.

43.     On March 27, 2003, Lanigan received correspondence from his counterpart at the eastern railroad, soliciting a conversation during an upcoming trade association meeting on "the fuel surcharge issue we discussed." The trade association meeting was the biannual National Freight Transportation Association ("NFTA") meeting that took place on April 2-6, 2003 at the Wigwam resort in Litchfield Park, Arizona. Representatives for Defendants and eastern railroads attended the meeting. Almost immediately following the NFTA meeting, a new internal directive

was issued at BNSF that was designed to ensure across-the-board enforcement of the FSC application: "Effective immediately and urgently per John Lanigan[:] Authority to omit FSC provision is to be granted to VP's only (who will also clear with John)."

44.     On April 1, 2003, BNSF's Chief Marketing Officer John Lanigan met with an eastern railroad to discuss "Fuel Surcharge." They discussed applying FSCs across *all* rail freight traffic; without distinguishing between carload and intermodal traffic. Defendants' senior executives and chief marketing officers oversaw their railroads' carload and intermodal traffic alike and sought to apply FSCs to them broadly. The junior executives overseeing the carload and intermodal traffic also attended and participated in the meetings.

45.     The same chief marketing officers who oversaw Defendants' carload traffic—and participated in meetings identified above—were responsible for Defendants' intermodal businesses. Moreover, those employees directly in charge of intermodal traffic were participants. BNSF's VP of Consumer Products and head of intermodal activities Steve Branscum and their counterparts for the eastern railroads attended the March 2003 meeting at which they discussed how the FSC programs of Defendants and eastern railroads were structured, and then adopted an "action item" for the BNSF and eastern railroad senior marketing officers to address "synchroniz[ing]" BNSF's FSC program with the programs of the others. UP's Brad King EVP of Network Design and Integration and his counterpart at an eastern railroad participated in the June 2003 meeting at which their senior executives discussed their FSC formulas, and their FSC strike prices. UP's intermodal group regularly imposed adjustable FSC provisions and their practice was to adjust them on ad hoc bases to align with BNSF's FSCs.

46.     In early 2003, BNSF also had been leaning toward a mileage-based carload FSC and had been trying to drum up support within the industry for a mileage-based FSC formula. But

on May 7, 2003—approximately one month after NFTA and BNSF's meeting with an eastern railroad on FSCs—BNSF abruptly abandoned that effort. Instead, it changed its FSC program to make it more aggressive by decreasing the formula's trigger price from an amount based on the per-gallon price of diesel fuel reflected in the On-Highway Diesel Fuel ("HDF") index, to $1.25, a number that Defendants understood "reflected the $23 WTI crude price used by UP."

47.     Moreover, before this time, the FSC had been adjusted monthly based on the WTI Index. The BNSF FSC had been based on the HDF Index. In or about July 2003, however, UP switched to the HDF Index. From that point on, BNSF and UP moved in lockstep and charged the exact same FSC percentage for each month for four or more years.

48.     BNSF and UP further agreed to administer the HDF Index in precisely the same way. Whenever the U.S. average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no FSC was applied. When the HDF Index exceeded $1.35 per gallon, BNSF and UP both applied an FSC of 0.5% for every five cent increase above $1.35 per gallon. So, for example, if the HDF Index rose to $1.55 per gallon, BNSF and UP would apply an FSC of 2%. The FSC would increase 2% for every 20-cent increase in the HDF Index.

49.     Defendants also coordinated when they would change their FSCs. They agreed that the FSC would be applied to shipments beginning the second month after the month in which there was a change in the HDF Index average price calculation. So, for example, if the HDF Index average price changed in January, Defendants would announce their new FSC percentage on February 1 (always on the first day of the month), and then apply the FSC to shipments in March. Defendants published their monthly FSC percentages on their websites, making any deviation from cartel pricing easily detectable.

50.    Defendants' agreed-upon coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their FSC programs, including use of the HDF Index for FSCs, setting the trigger point at $1.35 per gallon of diesel fuel, and applying the FSC in the second calendar month after the HDF Index average price had changed. The similarities are both too precise and too comprehensive to have been independent responses to any common market phenomenon that Defendants were facing.

51.    UP's move to the same fuel price index used by BNSF in July of 2003 is striking evidence of increasingly concerted conduct in light of the fact that, just two months before, UP had announced a different modification to its existing FSC program. In April of 2003, UP made modifications to the trigger points it used for adjusting FSCs in its program but did not change the index it employed. The fact that, just two months later, UP switched indices and began charging exactly the same FSCs as BNSF is further evidence that this switch was the result of concerted conduct.

52.    During the same time, Defendants increased coordination on FSCs with the eastern railroads, as part of Defendants' effort to implement and enforce FSCs across the country. An eastern railroad, for example, announced in January 2004 that it was adopting a new FSC policy, which mimicked the policy announced in March 2003 and was intended to "standardize" the railroad's FSC with the FSCs of Defendants. Consistent with the other FSCs that had been implemented, the eastern railroad would assess a 0.4% FSC when the price of oil on the WTI index exceeded $23 per barrel, and an additional 0.4% for every dollar increase thereafter. Also, the railroad's program would be based on the average price of oil for the preceding month rather than the prior requirement of thirty consecutive days. By this time, Defendants and the eastern railroads

had essentially uniform carload FSCs and remained in synch throughout the period of the conspiracy.

## PUBLICATION OF THE AIILF AND FIXING FSC RATES

53.     Even after having agreed to coordinate their FSCs, however, Defendants still faced a potential barrier to widespread use of FSCs: some private shipping contracts had cost escalation provisions that already accounted for fuel costs. BNSF, UP, and the eastern railroads solved this potential impediment by agreeing to remove fuel from the widely-used cost escalation indexes, paving the way for widespread imposition of the new FSC program and from which all competitors could earn excessive profits.

54.     In the fall of 2003, BNSF and UP initiated an effort in the AAR to get an agreement to take fuel costs out of the weighted RCAF and AII, and instead apply artificially high FSCs as a revenue enhancement mechanism: that is, use the "surcharge" to charge a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for that transport job.

55.     Pursuant to the agreements among Defendants and their conspirators who dominated the AAR board, Defendants caused the AAR to announce in December 2003 the creation of an unprecedented All Inclusive Index Less Fuel (the "AIILF"). This new index was similar to the prior industry indices (the AII and the RCAF), except that this new index excluded fuel as a component. The AAR announcement in December 2003 stated: "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel. This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component." This announcement, and the underlying decision to create the new index, were the collective action of

Defendants, and could not have been accomplished without the conspiracy. The new AIILF specified the fourth quarter of 2002 as its base period.

56.    Defendants BNSF, UP, and the eastern railroads also agreed to cause the AAR to inaugurate the AIILF so that they could begin assessing separate, stand-alone FSCs, applied against the total cost of rail freight transportation, and coordinate that practice. The creation of this new index was an important, carefully-planned step taken collectively by Defendants to allow implementation and continuation of their price fixing conspiracy—a conspiracy that would enable Defendants to widely impose price increases on the entire cost of rail freight transport and thereby obtain additional revenues far beyond any actual increases in fuel costs. This step was a notable departure from past practice and marked the first time that the AAR created a cost escalation index without a fuel cost component.

57.    BNSF has admitted that it worked through the AAR to accomplish this revenue-generating measure in 2003. When asked how BNSF would be able to apply the new revenue-based FSCs into contracts with coal shippers, John Lanigan, BNSF's Chief Marketing Officer, responded that BNSF would be able to do so because of the changes made to the RCAF through the AAR. Referring to Matthew Rose, BNSF's Chairman, President, and CEO, Lanigan stated: "What happened last year, and Matt led the charge on there, is that there's a new index that [the AAR] has that's basically an index without fuel. . . . So we'll do RCAF less fuel plus a direct fuel surcharge in the future."

58.    Almost immediately after the announcement in December 2003 of the new AIILF (the cost escalation index without fuel) and pursuant to the conspiracy, Defendants and other railroads suddenly moved into lockstep with FSCs based on the WTI Index. This move into

lockstep was part and parcel of, and flowed from, the aforementioned agreements reached and implemented by BNSF, UP, and their conspirators no later than 2000.

59.     Specifically, the eastern railroads agreed to apply an FSC whenever the monthly average WTI price exceeded $23 per barrel of crude oil. When that happened, the railroads' rates were increased 0.4% for every $1 that the price of WTI oil exceeded $23 per barrel. So, for example, if the price of WTI oil was $28 per barrel, the FSC percentage would be 2%. The FSC would be adjusted upward 2% for every $5 increase in the WTI average price.

60.     Defendants also coordinated with eastern railroads on when they would change their FSCs—two calendar months after the WTI Index had adjusted, thereby adopting the same FSC price timing used by Defendants. For example, if the WTI average price exceeded $23 per barrel in January, the eastern railroads would assess the applicable FSC percentage to all bills of lading dated in the month of March. In this way, Defendants could apply exactly the same FSC percentage month after month. Their monthly FSC percentages were published on their websites, making any deviation from cartel pricing easily detectable.

61.     The coordination led by Defendants is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their FSC programs: including using the WTI Index for FSCs, setting the trigger point at $23 per barrel, and applying the FSC in the second calendar month after the average price of WTI oil had changed. The similarities, and the coordination among Defendants are too precise and too comprehensive to have been independent responses to any common market phenomenon that Defendants were facing.

62.     There was no legitimate business justification or natural explanation for the collective action of Defendants and other railroads to cause the AAR to adopt and publish the

AIILF. Such a "revenue-based" FSC bore no direct relationship to Defendants' actual increase in fuel costs. The FSC program was not a cost recovery mechanism, but a revenue enhancement measure that could only have been accomplished by Defendants' conspiratorial action of removing fuel from the widely used cost escalation indexes. The AII and RCAF both included a fuel cost component, and Defendants had used these indices for decades to measure fuel-cost increases. As an empirical matter, the fuel component of the AII and RCAF would have permitted the Defendants to recover all of their increased fuel costs during the conspiracy. Thus, the motivation in collectively causing the adoption of the AIILF could not have been greater fuel cost recovery or more efficient fuel cost recovery.

63.     The actions by Defendants were not independent responses to a common problem of increasing fuel costs. Rather, the only purpose in taking these collective actions was to begin wide application of more aggressive stand-alone FSCs to revenue (i.e., the entire base rate for the freight shipment), not costs; to act in concert with one another in setting FSC prices and demanding them from shippers and customers; and to ensure collective enforcement of the program. That is, pursuant to their conspiracy, Defendants would now be able to undermine resistance from shippers and begin across-the-board application of the supposed fuel cost increase percentage to the entire cost of the freight shipment (notwithstanding that fuel only accounts for a portion of the costs of the shipment). Through these collective actions, Defendants and other railroads planned to use the stand-alone FSC as an easy way to dramatically increase profits without having to wait for new rail capacity to come on line to meet growing demand—so long as these railroads participated by not competing on FSC prices to undercut one another.

64.     In November of 2004, BNSF's John Lanigan "visit[ed] with his railroad counterparts at the upcoming NEMC [Network Efficiency Management Committee] / SOMC

[Safety & Operations Management Committee] meeting in Kansas City to judge the appetite for a mileage-based FSC program." The other Defendants "pushed back as expected." Again, Defendants had collectively rebuffed the concept of an FSC that could potentially be more correlated with actual fuel costs, agreeing instead to continue charging supracompetitive rate-based FSCs.

65.     With the conspiracy further refined and focused on FSCs, Defendants moved in lockstep and each utilized the same FSC formula (which produced the same FSC percentage) from at least 2003 and throughout the effective time of the conspiracy. Defendants' coordination with the eastern railroads also further refined and focused their implementation of FSC, and each eastern railroad also utilized the same FSC formula from at least early 2004 and throughout the effective time of the conspiracy.

66.     In stark contrast to the uniformity in FSC formula and percentage, fuel cost as a percentage of operating cost and fuel efficiency differed widely among railroads. Absent collusion, it is extremely unlikely that Defendants and their conspirators, in both the west and the east, would independently adopt the same formula and price their FSCs to arrive at the identical percentage month-after-month and year-after-year. The fact that Defendants and their conspirators moved in uniform lockstep indicates that Defendants were coordinating their behavior and prices for FSCs. In addition, the advance announcements of FSCs was an important implementation and enforcement mechanism for the conspiracy.

67.     Although Defendants began to adjust their FSC programs after the 2007 STB ruling discussed below—including, in some cases, by adopting mileage-based FSCs—Defendants continued to engage in discussions concerning FSCs following the STB ruling, and to apply rate-

21

based FSCs that are the subject of this case to their shippers pursuant to agreements entered into before and after the STB Ruling.

68.     While the above formulas and percentages reflect the FSCs applied by Defendants to their carload businesses (i.e., shipments that travel from origin to destination only by railcars), Defendants also coordinated in the same way with respect to the FSCs applied to their intermodal business (i.e., shipments that travel by rail and one other mode of transportation such as truck or ship).

## THE ACROSS-THE-BOARD APPLICATION OF FSCs

69.     Defendants and the eastern railroads recognized that the coordinated FSCs were more aggressive and could generate substantially more revenue. For example, describing the new FSC program that resulted from Defendants' coordination, an eastern railroad executive remarked: "While the above seems somewhat benevolent, it is actually a large increase in fuel surcharge billings – maybe as much as 100%." In addition, an internal email from April 2003 remarked, "By dropping the base to $23 per barrel, raising the percentage yield and talking [sic] it sooner, the change is in fact a blatant general rate increase, and will appear so to customers."

70.     Defendants recognized that their new aggressive FSC scheme could be undermined by competition between railroads. A 2003 internal eastern railroad memorandum recognized that moving to the more aggressive formula would "run the risk of losing the surcharge altogether. . . . The loss of the FSC clause with just a few major customers could offset some of the gains derived from the new FSC." And, in a 2005 BNSF "Risk Assessment" memorandum, BNSF observed the, "risk that competitors reverse course on using a fuel surcharge" to gain market share, recognizing that "it would only take one competitor to abandon this in an attempt to gain market share to cause this to fail."

71.     To ensure that shipper resistance would not interfere with Defendants' conspiratorial goals, each Defendant adopted policies to apply FSCs to 100% of its traffic and tracked its progress toward attaining that goal. This enforcement required "total FSC discipline" on all shipments, including intermodal. For example, in 2004, BNSF's marketing leadership began an initiative to monitor FSC "adherence" on a quarterly basis. These adherence reports track topics such as FSC revenue, the amount of newly-issued price authorities including FSCs, and top opportunities (e.g., shippers with expiring contracts that do not include an FSC). The reports— showing increasing FSC coverage each year—were presented to the chief marketing officer with a goal of achieving a 100% participation rate for BNSF's shippers. The same year, BNSF issued a "Mandate" that the "Marketing Team should strive for 100% fuel coverage by account" and a "business unit strategy of re-signing all expiring contracts with full fuel surcharge provisions."

72.     Customers were forced to pay the FSCs despite one BNSF regional sales manager's report that "the response [to a 9% FSC pricing update] was ferocious." He requested some "propaganda" because he could only "muddle through an explanation" that did not "satisf[y] anyone."

73.     Starting in early 2004, UP engaged in similar analyses. An analysis of UP's FSC coverage was also performed for the chief marketing officer—who had requested "each of the business teams to be looking for ways to expand fuel surcharge coverage in 2004." An internal presentation stated that UP had "adopted a standard Intermodal fuel surcharge policy that is applied universally to all of our customers as their contracts expire. No exceptions."

74.     Defendants also ensured that eastern railroads similarly adhered to the uniform FSCs. An eastern railroad monitored its effectiveness in applying FSCs to its shippers and started tracking its progress toward implementing its FSC mandate—that "[e]verything is subject to fuel

surcharge." The railroad tracked the progress that its individual marketing teams were making toward widespread FSC application and tracked contracts without FSCs to ensure they would receive FSCs upon renewal. Its carload policy was indistinguishable from its intermodal policy. A 2006 eastern railroad analysis projected increased coverage of its intermodal FSC on the presumption that "100% of contracts that come due will be renewed with full fuel surcharge."

75.     Another eastern railroad also tracked its ever-expanding FSC coverage and its senior executive instructed division heads to identify "the largest remaining contracts (including annual revenue involved) that do not have fuel surcharge application" to "see how much we plan to move this upward in 2006 and 2007." The railroad's intermodal VP said, "Seniors are going to continue to push us aggressively" to avoid FSC exceptions. The railroad's VP of intermodal marketing reported in 2006 that there were only "a handful" of intermodal customers not paying the standard FSC and that efforts were being made to bring these customers onto the standard program. At this time, only one intermodal customer was able to avoid paying any fuel surcharge and the eastern railroad expected to stop that avoidance when the customer agreement was renewed the next year.

76.     Defendants also policed the conspiracy by exchanging FSC coverage data. For example, at a meeting in the fall of 2003 BNSF informed senior executives for an eastern railroad of the percentage of its carload and intermodal business having either an FSC or escalator clause. Subsequent to that meeting, the competitors asked how their coverage compared to BNSF's. After a meeting between BNSF and an eastern railroad in late 2004, BNSF sent the eastern railroad a report addressing FSC coverage for "all [BNSF] traffic" that moved under the price authority in the past twelve months.

24

77.     In furtherance of the conspiracy, Defendants and other railroads also instituted strict policies against granting exceptions to the standard FSCs and declined to negotiate discounts on the FSCs and overall contract rates. Shippers from many different industries, some with significant economic power, tried to negotiate the FSC percentages, but were told by the Defendants that the FSCs were "not negotiable."

78.     Defendants and other railroads also enforced strict policies against discounting base rates to offset the standard FSCs. In an internal eastern railroad email, an executive remarked: "I want to underscore that we should not be foregoing base rate increases in return for FSC application. That is a shell game that all product managers should not play." A 2004 presentation to BNSF's Consumer Products business unit,[3] which includes both domestic and international intermodal traffic, identified as part of the "CEO's Goals for Marketing's Fuel Surcharge Programs" that "Discounted programs unacceptable. CEO will not sign contracts not meeting the above criteria. . . . Minimize price/fuel surcharge tradeoffs."

79.     As a result of these and related policies, any negotiations with Defendants' shippers about FSCs that took place, including with NYK, started from the standard, supracompetitive FSC.

80.     Even an individual Defendant's FSC formula that stayed the same during the conspiracy caused shippers, including NYK, to pay supracompetitive prices, because Defendants' machinations enabled them to collect surcharges that were theretofore uncollectable due to competitive pressures. By uniformly applying and enforcing their FSCs, Defendants collected FSCs they would have been unable to collect from shippers but for their conspiracy.

---

[3] BNSF has four business units: Agricultural Products, Coal, Consumer Products, and Industrial Products.

81.     In addition, Defendants and other railroads applied their standard FSCs uniformly to all traffic and commodities. For example, in October of 2005, an eastern railroad advised UP as follows: "We only have 1 fuel surcharge mechanism which applies to all commodities. Our corporate directive is to stay with the standard language and avoid modifying it."

82.     Defendants and other railroads also imposed standard FSCs on all shippers without regard to whether the shipper might have access to alternative modes of transportation. In written testimony submitted to Congress, the Chairman of an eastern railroad recognized that even so-called "captive" shippers—shippers without access to alternative modes of transportation—have leverage in negotiating a better rate/service package on traffic at single served facilities. He explained:

> Most large companies have multiple rail-served facilities with some of the facilities served by one railroad, some facilities served by another railroad and some facilities served by two railroads. The customer uses its traffic at the dually served facilities to negotiate a better rate/service package on traffic at the single served facilities. That is one source of leverage. Another source is product competition. For example, assume we are the sole serving carrier at a chemical plant that ships to numerous receivers. When the receiver can use another product in lieu of the one produced at our solely served facility, we will lose the business. . . . Another major source of competition is geographic competition. . . . In short, even where there is only one railroad serving a facility, there are market factors at play. These competitive constraints are real.

Before the conspiracy, captive shippers could negotiate out of the FSCs. But during the conspiracy they could not.

## THE STB DECISION

83.     On January 25, 2007, the STB, which regulates certain aspects of the railroad industry, issued an administrative decision concluding that the railroads' practice of computing FSCs as a percentage of base rate for rate-regulated rail freight transport was an "unreasonable practice," because the FSCs are not tied to the fuel consumption associated with the individual

movements to which they are applied. *Rail Fuel Surcharges*, STB Ex Parte No. 661 (Jan. 25, 2007). In its ruling, the STB explained that:

> After considering all of the comments, we affirm the preliminary conclusion in the August decision that it is an unreasonable practice to compute fuel surcharges as a percentage of the base rates. Because railroads rely on differential pricing, under which rates are dependent on factors other than costs, a surcharge that is tied to the level of the base rate, rather than to fuel consumption for the movement to which the surcharge is applied, cannot fairly be described as merely a cost recovery mechanism. Rather, a fuel surcharge program that increases all rates by a set percentage stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied. Two shippers may have traffic with identical fuel costs, but if one starts out with a higher base rate (because, for example, it has fewer transportation alternatives), it will pay dramatically more in fuel surcharges.

*Surface Transportation Board Decision, Rail Fuel Surcharges* (STB Ex Parte No. 661, at 6, January 26, 2007).

84.     The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint). The STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

85.     As detailed above, pursuant to their conspiracy, Defendants and other railroads applied the same unreasonable FSC practices addressed by the STB to the private rail freight transportation contracts and other unregulated freight transport such as the freight rail services purchased by NYK.

## THE CONSPIRACY SUCCEEDS AND NYK IS HARMED

86.     Defendants reaped huge, supracompetitive profits as a result of the success of the conspiracy. Through their agreement to coordinate on FSCs, Defendants realized billions of dollars in revenues in excess of their actual increase in fuel costs from the customers on whom they imposed the FSC.

87.     Defendants, like the eastern railroads, recognized that coordinated FSCs in fact resulted in significant over-recovery of fuel price increases.

88.     UP senior management instructed that fuel surcharges were not intended to be set at "some 'trying to make whole' value" and UP's CFO saw "nothing wrong with recovering at a rate greater than 100%." An October 2005 presentation shows UP estimated greater than 100% of incremental fuel cost recovery through FSCs for each of its six business groups. An eastern railroad, for example, recognized by July 2004 that "[c]urrent FSC revenues exceed the relative increase in fuel costs when compared to the $23 WTI base," and its senior executive testified that in 2005, the co-conspirator's "increase in Fuel Surcharge revenue exceeded the increase in its diesel fuel, gasoline, and lubricant expenses."

89.     BNSF's average cost for diesel fuel in 3rd Quarter 2003 was $0.846 per gallon and its average cost of diesel fuel for 3rd Quarter 2004 was $0.988 per gallon. Thus, BNSF's cost of fuel increased 14.4% from 3rd Quarter 2003 to 2004. In contrast, the FSC charged by BNSF based on the HDF 3rd Quarter 2003 price was $1.46 per gallon and $1.83 per gallon in 3rd Quarter 2004, amounting to a 25.3% increase. As a result of this disparity in increase percentages, shippers purchasing from BNSF paid more for unregulated freight rail services than what they would have paid absent the conspiracy. Shippers of unregulated freight from UP similarly overpaid during this and other periods.

90.     This over-recovery applied to intermodal and carload traffic alike. BNSF recognized that Defendants' coordination of fuel surcharges for intermodal shipments made them a "'profit-center' . . . for the customers that participate." UP's finance department calculated a "recovery percentage" of 188% for its intermodal group for the first quarter of 2005.

91.     By calculating FSCs as a percentage of the shipping rate, Defendants deflected attention from the cost savings they achieved through fuel efficiency gains. As explained in a 2007 AAR publication, Defendants' fuel efficiency is "constantly improving." BNSF, for example, disclosed in 2005 that it had achieved a 9% improvement in fuel efficiency over the prior ten years. In 2006, the railroads could, on average, move one ton of freight 423 miles on one gallon of diesel fuel.

92.     As a result, the conspiracy worked as planned to help to remove the competitive pressures that had driven down their revenues and profits prior to 2000. Following Defendants' agreement to coordinate their FSCs, Defendants total revenues skyrocketed, with Defendants reporting record revenues and profits virtually every year. As noted above, Defendants themselves attributed these record figures in large part to FSCs.

93.     NYK purchased at least $1 billion in intermodal freight rail shipping services from Defendants during their conspiracy. NKY purchased these services pursuant to multiple contracts with Defendants. Defendants' FSCs, assessed pursuant to their conspiracy, were incorporated into the pricing terms for NYK's contracts.

94.     NYK had no choice but to contract with Defendants and pay the FSC rates they demanded because, as noted above, Defendants controlled about 90% of rail freight traffic in the western United States, and there were no reasonably substitutable providers of nation-wide intermodal rail services available to NYK.

95.     As NYK's contracts with Defendants were entered or renegotiated during the period of the conspiracy, inflated FSCs assessed pursuant to Defendants' conspiracy were incorporated into the terms. By no later than 2000, NYK had begun to pay supracompetitive FSCs to Defendants as a result of their conspiracy. NYK continued to pay supracompetitive FSCs to

Defendants for several years after the conspiracy ended, pursuant to the multi-year contracts NYK had entered or renegotiated with Defendants prior to the end of the conspiracy.

96.     NYK's contracts with the Defendants generally were for three to five-year terms and subjected to inflated FSC payments. The NYK contract entered into in 2009 extended into 2013 with the same FSC formula which applied in the contracts during 2000 to 2008. NKY continued suffered substantial economic harm as a result of Defendants' unlawful conduct. NYK purchases of unregulated rail freight transportation services from Defendants included FSC assessments that were inflated by many millions of dollars as a result of Defendants' conspiracy.

## COUNT I
### (Violation of Section 1 of The Sherman Act and Section 4 of the Clayton Act)

97.     Plaintiffs incorporate by reference the allegations in the paragraphs above as if they were fully set forth herein.

98.     Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

99.     The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for FSCs for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

100.    Defendants' contract, combination, agreement, understanding, or concerted action occurred within the flow of, and substantially affected, interstate and international commerce.

101.    Defendants' unlawful conduct was through mutual understandings or agreements by, between, and among Defendants and their conspirators.

102.    The contract, combination, or conspiracy has had the following effects:

    a.    Prices charged to NYK for FSCs applied to unregulated rail freight transportation were fixed and/or maintained at supracompetitive levels;

    b.    NYK has been deprived of the benefits of free, open, and unrestricted competition in the market for rail freight transportation services; and

    c.    competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed, and eliminated.

103.    As a proximate result of the conspiracy described herein, NYK paid FCSs in connection with those unregulated rail freight transportation services that NYK would not have paid in the absence of the conspiracy; and the prices NYK paid to Defendants for those unregulated rail freight transportation services on which FSCs were imposed were greater than the prices NYK would have paid absent the conspiracy alleged herein.

104.    NYK has therefore been injured in its business and property by reason of Defendants' antitrust violations.

105.    WHEREFORE, NYK prays for relief as follows:

    a.    That the unlawful contract, combination, and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

b.      That NYK recover compensatory damages, as provided by law, determined to have been sustained by NYK, and that judgment be entered against Defendants on behalf of NYK;

c.      That NYK recover treble damages, as provided by law;

d.      That NYK recover costs of the suit, including attorneys' fees, as provided by law; and

e.      For such further relief as the Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, NYK demands a jury trial as to all issues triable by a jury.

March 10, 2020                 Respectfully submitted,


*/s/ Stephanie A. Ackerman*

Stephanie A. Ackerman
**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Tel: (212) 589-4200
Fax: (212) 589-4201
Email: sackerman@bakerlaw.com


John R. Fornaciari
Danyll W. Foix
Sally Qin
**BAKER & HOSTETLER LLP**
1050 Connecticut Ave. NW, Suite 1100,
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1789

*Attorneys for Nippon Yusen Kabushiki Kaisha Line and NYK Line (North America), Inc.*

## <u>LOCAL RULE 11.2 CERTIFICATION</u>

I hereby certify that the matter in controversy is not the subject of any other action pending in any other court or of any pending arbitration or administrative proceeding, although this matter is related to several matters brought by other plaintiffs against the same Defendants currently proceeding as Multidistrict Litigations *In Re: Rail Freight Fuel Surcharge Antitrust Litigation*, MDL No. 1869, and *In Re: Rail Freight Fuel Surcharge Antitrust Litigation (No. II)*, MDL No. 2925, pending in the District of Columbia. Plaintiff is also aware of similar matters brought by other plaintiffs pending in the District of New Jersey against the same Defendants including:

- *BASF Corp., BASF Catalysts LLC, Cognis USA LLC, Procat Testing LLC v. BNSF Railway Co., CSX Transportation, Inc., Norfolk Southern Railway Co., Union Pacific Railroad Co.*¸ No. 1:19-cv-21986-RMB-JS;
- *AP Moller-Maersk A/S, Maersk Inc. and Maersk Line UK Limited v. BNSF Railway Co., CSX Transportation, Inc., Norfolk Southern Railway Co., Union Pacific Railroad Co.*, No. 1:19-cv-21745-RMB-JS; and
- *Campbell Soup Co., Campbell Soup Supply Co., LLC, Pepperidge Farm, Inc., Campbell Company of Canada, Campbell FoodService Co., Joseph Campbell Co. v. BNSF Railway Co., CSX Transportation, Inc., Norfolk Southern Railway Co., Union Pacific Railroad Co.*, No. 1:19-cv-18567-RMB-JS.

March 10, 2020                                   Respectfully submitted,

                                                 */s/ Stephanie A. Ackerman*

                                                 Stephanie A. Ackerman
                                                 **BAKER & HOSTETLER LLP**
                                                 45 Rockefeller Plaza
                                                 New York, New York 10111
                                                 Tel: (212) 589-4200
                                                 Fax: (212) 589-4201
                                                 Email: sackerman@bakerlaw.com

                                                 *Attorneys for Nippon Yusen Kabushiki Kaisha Line and NYK Line (North America), Inc.*